**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0521n.06

**No. 10-3327**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ADAM P. HALL, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | **FILED** |
| | ) | ***Jul 27, 2011*** |
| v. | ) | LEONARD GREEN, Clerk |
| | ) | |
| OHIOHEALTH CORPORATION DOCTOR'S HOSPITAL, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee, | ) | |
| | ) | |
| KIRK L. HILLIARD, D.O., Vice President of Medical Education Doctor's Hospital; BRUCE WERHAN, D.O., Director of Anesthesia Doctor's Hospital; DOE CORPORATION (105), Names and Addresses unknown. | ) | |
| | ) | |
| Defendants. | ) | |

Before: SUTTON and COOK, Circuit Judges; GREER, District Judge.[*]

COOK, Circuit Judge. Adam Hall worked as an anesthesiology resident at OhioHealth Corp.'s Doctors Hospital until OhioHealth terminated him for ethics violations, unprofessional conduct, and poor academic performance. After receiving treatment for a corticosteroid addiction, Hall applied for reinstatement, a request that OhioHealth refused. Hall, believing that the hospital declined to reinstate him because of his former addiction, acquired right-to-sue letters from the federal and state authorities and sued OhioHealth for disability discrimination. The district court

---

[*]The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

granted OhioHealth summary judgment. Because Hall's evidence of pretext, construed in the light most favorable to him, constitutes nothing more than speculation, we affirm.

I.

Hall has participated in his fair share of residency programs. After graduation, he joined an anesthesiology program in California, which dismissed him when he failed his boards. A few months later, Hall began a residency program in Missouri, only to meet the same fate but for different reasons: he failed to report for a shift and then lied about his whereabouts. Not dissuaded, Hall found an anesthesiology resident spot at one of OhioHealth's hospitals near Columbus.

Though Hall relocated, his residency troubles continued. During his first year at the hospital, OhioHealth reprimanded Hall for inappropriate interactions with staff and inattention to patients when administering anesthesia—such as calling family and friends, and engaging staff in personal conversations. The hospital, concerned about Hall's behavioral, interpersonal, and professional competencies, placed him on academic probation and required him to attend behavioral counseling.

Similar problems arose during Hall's second year at OhioHealth. He mysteriously flushed two syringes down a toilet; threw a bloody sponge at a nurse; and received another negative evaluation, which emphasized his lack of attention to detail, his listening and commenting on others' conversations during surgery, and his continued failure to assess patients' holistic health during anesthesia. Hall also self-prescribed a pain medication, in violation of his temporary medical license. When a supervisor confronted him about the unauthorized prescription, Hall explained that

he suffered from a painful connective tissue disorder in his feet. Hall continued to attend counseling, however, and at the end of his second year OhioHealth certified to the state medical board that Hall was in "good standing" with the hospital.

Despite the counseling and good-standing certification, Hall's evaluations at the beginning of his third year came off no better than the earlier ones. They criticized him for disappearing during the day, showing up unprepared for his rounds, and neglecting academic assignments. They also noted his general haste and lack of interpersonal skills.

Against this backdrop, OhioHealth then caught Hall fraudulently diverting Celestone, a corticosteroid, to treat his foot pain: he wrote a Celestone prescription in a patient's name, charged the patient at the hospital pharmacy, and then injected himself with the drug. Hall chose Celestone because the hospital pharmacy ran out of Kenelog—a corticosteroid that he had diverted on other occasions.

Because of his continual unprofessional conduct and academic deficiencies, Dr. Hilliard and Dr. Werhan, two supervisors, terminated Hall's contract. Though a reconsideration committee upheld the decision, Dr. Hilliard advised Hall to apply for reinstatement if he fixed his "problems." Throughout his time at the hospital, including his termination proceedings, Hall never advised anyone of his corticosteroid addiction.

Hall completed an addiction program and, adhering to Dr. Hilliard's advice, applied for reinstatement. A new supervisor, Dr. Blackwell, evaluated his application, reviewed his file, and

spoke with Dr. Werhan. Dr. Werhan told her that he lacked any trust in Hall, would be unwilling to train him, and did not want him readmitted to the program. Dr. Blackwell rejected Hall's application, and the hospital notified Hall of the decision in a one-paragraph, no-reasons-given letter. He then sued OhioHealth for disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and Ohio's anti-discrimination laws, *see* Ohio Rev. Code Ann. §§ 4112.01–4112.99.

## II.

The district court, applying the *McDonnell Douglas* burden-shifting scheme to both claims, granted OhioHealth summary judgment. *See Whitfield v. Tennessee*, 639 F.3d 253, 259–60 (6th Cir. 2011); *Grooms v. Supporting Council of Preventative Effort*, 809 N.E.2d 42, 46–47, 69 (Ohio Ct. App. 2004). The court assumed a prima facie case of discrimination and found that OhioHealth articulated three legitimate, nondiscriminatory reasons for not reinstating Hall: his failure to accumulate the requisite medical knowledge as an anesthesiology resident; his pattern of unethical and unprofessional conduct; and Dr. Werhan's unwillingness to train Hall because of their long, tumultuous history. But after the burden shifted back to Hall, he did not produce sufficient evidence for a jury to reasonably reject the hospital's proffered explanations. The court thus held that he failed to establish pretext and granted OhioHealth summary judgment.

Hall appeals the grant of summary judgment to OhioHealth, disputing only the court's holding on pretext. We review that decision de novo, *see Pluck v. BP Oil Pipeline Co.*, 640 F.3d

671, 676 (6th Cir. 2011), asking whether there is a genuine dispute as to any material fact regarding

pretext so as to preclude summary judgment, *see* Fed. R. Civ. P. 56(a).

III.

Hall contends that he showed, by a preponderance of the evidence, that OhioHealth's

proffered nondiscriminatory reasons did not actually motivate it to reject his application, *see Manzer*

*v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*

*by Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009), *as recognized in Geiger v. Tower*

*Auto.*, 579 F.3d 614 (6th Cir. 2009), and that it is more likely that OhioHealth discriminated against

him because of his former corticosteroid addiction, *see Smith v. Leggett Wire Co.*, 220 F.3d 752, 759

(6th Cir. 2000). We disagree.

Hall pulls three facts from the record in his effort to undermine OhioHealth's proffered

reasons and establish a genuine issue of material fact regarding pretext. We address each in turn and

conclude that his evidence amounts to nothing more than speculation. *See Woythal v. Tex-Tenn*

*Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) ("[M]ere personal belief, conjecture[,] and speculation are

insufficient to support an inference of . . . discrimination." (internal quotation marks and citation

omitted)).

A.

Hall first notes that OhioHealth certified to the state medical board that he was in "good

standing" with the hospital at the end of his second year, despite his poor performance and

unprofessional conduct. But Hall downplays a critical incident in his tenure at OhioHealth, one that occurred *after* the certification of good standing: his diversion of Celestone. This unethical and fraudulent conduct—theft, even—weighed heavily against his reinstatement because it confirmed his pattern of unacceptable behavior and extinguished any remaining trust that the attending physicians placed in him.

Nevertheless, Hall argues, a reasonable jury could find that OhioHealth, through its good-standing certification, pardoned him for his past conduct but then used that same conduct to disguise its true motivation for denying reinstatement. Yet Hall cites not a single fact from the record supporting this theory. Rather, given the hospital's never-ending insistence that he attend counseling, the good-standing certification signifies that OhioHealth wanted to protect its investment in him and still believed, as his second year came to a close, that he could succeed as a resident despite his prior transgressions. His later Celestone diversion destroyed all hope. Hall's theory that the hospital pardoned him is less than conjecture; the record entirely belies it.

B.

Hall next focuses on Dr. Werhan's admitted unwillingness to train him, if reinstated, because of their "long history." Because the historic discord between the two stems primarily from Hall's chronic foot pain and corticosteroid addiction, argues Hall, Dr. Werhan's admission creates a genuine issue of fact whether disability discrimination motivated OhioHealth's decision.

This theory—that Dr. Werhan's discriminatory animus seeped into OhioHealth's reinstatement decision—fails for one simple reason. Hall's addiction does not excuse his unethical, unprofessional conduct that so discouraged Dr. Werhan. *See Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1182–83 (6th Cir. 1997) ("[W]hile the ADA protects an individual's status as an alcoholic, merely being an alcoholic does not insulate one from the consequences of one's actions." (internal quotation marks and citation omitted)). And, as the undisputed record demonstrates, it was solely Hall's unethical conduct—diverting Celestone, in particular—that prompted Dr. Werhan's negative opinion of him and the adverse recommendation to Dr. Blackwell.

## C.

Finally, Hall contends that OhioHealth offered inconsistent explanations for its decision to reject him: Dr. Hilliard advised him to apply for reinstatement, but, when he did, OhioHealth sent him a terse letter declining even to consider his application. Dr. Blackwell later testified, however, that she evaluated the application and rejected it for the same reasons OhioHealth initially terminated Hall.

In fact, OhioHealth gave consistent explanations for its decision—Hall's poor academic performance, and his unethical and unprofessional conduct. Dr. Blackwell, consistent with Dr. Hilliard's representation, fully evaluated Hall's file and reinstatement application. She even began her thorough investigation, which included speaking to Dr. Werhan, *before* receiving the application because she learned that Hall would soon apply. Based on what she saw, Dr. Blackwell decided not to reinstate Hall. In the face of this uncontroverted testimony—and the undisputed fact that the

reinstatement decision rested solely with Dr. Blackwell—OhioHealth's rejection letter advising Hall that his termination "was final and is not subject to any reinstatement or reconsideration process," however awkwardly phrased, does not suggest that it never even considered his application. Hall's unsupported speculation otherwise creates no genuine issue of material fact.

IV.

For these reasons, we affirm the district court's judgment.